**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| KIM McCLOUD, | ) | |
| | ) | |
|  Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 06-0216-BH-C |
| JOHN E. POTTER, | ) | |
| POSTMASTER GENERAL, | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
|  Defendant. | ) | |

**ORDER**

This action is before on defendant's motion for summary judgment (Doc. 27), as to which the plaintiff has failed to timely respond. For the reasons stated in the separate Order entered this day (Doc. 37), the Court concludes that the facts set forth in the defendant's motion are undisputed and that the defendant is entitled to a judgment in his favor as a matter of law.

**FINDINGS OF FACT**

**Introduction**

1. Kim R. McCloud, an African-American female, filed suit against John E. Potter, Postmaster General, United States Postal Service ("Defendant" or "USPS") on April 6, 2006, claiming violations of to the Rehabilitation Act of 1973 ("Rehab Act"), as amended, § 501, 29 U.S.C. § 791, *et seq*.; American With Disabilities Act of 1990, Title I, 42 U.S.C. § 12101 *et seq*; and on the basis of Plaintiff's race and sex in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42

U.S.C. § 2003e, *et seq*., to recover compensatory and punitive damages.  (Complaint, Doc. 1).

2.    On March 14, 2005, Defendant verbally denied McCloud's voluntary request for light duty (herein "RFLD") made that day which contained her chiropractic doctor-imposed fifteen (15) pound lifting limit.  On March 29, 2005, Defendant denied this request in writing on the grounds that an employee must be able to lift at least twenty (20) pounds to be considered for light duty. (Complaint, ¶ 13; Ex. 1; McCloud Deposition (hereinafter "Depo"), p. 155, lines 6-15).

3.    On May 11, 2005, Defendant denied in writing Plaintiff's request for light duty  (submitted on May 3, 2005), which contained a revised chiropractic doctor-imposed lifting limit of twenty (20) pounds, among other restrictions.  Joel Hall, the installation head or plant manager, stated that the basis for denial was the conflicting medical advice from different doctors and conflicting reports from the same doctor as to her prognoses. (Complaint, ¶ 13; Ex. 2; Declaration of Joel Hall).

4.    McCloud claims she is a qualified individual with a disability and has not been accommodated. (Doc. 1, ¶¶ 7-9).

**PROCEDURAL HISTORY**

5.    In response to the Court's show cause order of June 21, 2006 (Doc. 8), . Plaintiff agreed (Doc. 11) to the dismissal of her claim for punitive damages. Accordingly, the Court entered an Order on July 17, 2006 (Doc. 12) dismissing any claim or demand for punitive damages.

6.     Though not mentioned in the Complaint (Doc. 1) and not included in any union grievance or Plaintiff's two EEO complaints, in response to discovery requests, McCloud alleges another claim: that she also provided Defendant a RFLD with a revised lift limit of twenty (20) pounds on March 31, 2005.

7.     In answers to discovery Plaintiff alleges that Defendant's denials of Plaintiff's two requests for light duty were motivated by an intention to retaliate against her as a result of her having engaged in protected activities prior to these occurrences. (Complaint, ¶¶ 10, 13 [Doc. 1]; Ex. 3, Defendant's Interrogatories, No. 1; Ex. 4, Plaintiff's Response No. 1).

8.     In answers to discovery, Plaintiff also alleged unlawful discrimination in the slow or late payment of a bilateral settlement of the grievance (regarding the May 11, 2005, denial of the May 3, 2005, RFLD) reached between her union representatives and Defendant on July 19, 2005.  This claim was the issue presented in Plaintiff's EEO Complaint No.1H-366-0006-06 (Complaint, ¶ 18 [Doc. 1]; (Ex. 3, Defendant's Interrogatories, No. 1; Ex. 4, Plaintiff's Response No. 1).

9.     Plaintiff ultimately agreed the only issues included in this civil action are those issues articulated and decided in the two EEO complaints (No. 1H-366-0006-06 [alleged slow payment of settlement] and No. 1H-366-0011-05 [alleged unlawful discrimination in the light duty requests being denied on March 14, 2005; March 29, 2005; and May 11, 2005]) (Ex.3, Defendant's Interrogatories, No. 1; Ex. 4, Plaintiff's Response No. 1).

3

10.     Plaintiff has agreed that if she has or ever had any worker's compensation claim, it is <u>not</u> included in this civil action. (Ex. 5, Defendant's Request for Admission No. 11; Ex. 4, Plaintiff's Admission Response No. 11).

11.     The parties came to mutual agreement on Plaintiff's complete record on January 23, 2007 (Exhibits 6, 7).

12.     In reliance on Plaintiff's identification of her entire record, Defendant made a complete copy of the Plaintiff's agreed upon record, it was scanned, Bates® numbered and compiled into a three ring binder (containing pages 00001 to 00433) and then hand-delivered to Counsel for Plaintiff on March 6, 2007 well before Plaintiff's deposition. (Ex. 8).

13.     As agreed during Plaintiff's deposition, the parties filed a Joint Stipulation for Partial Dismissal (Doc. 21) dismissing with prejudice all claims for damages in this pending civil action which arose from the EEO Complaint No.1H-366-0006-06 (alleged slow payment of settlement) the details of which will be outlined herein-below. (Depo, p. 103, lines 17-23; p.104, lines 6-10).

14.     The only claim pending in this civil action is that which is the subject of the Final Agency Decision issued January 6, 2006 by the EEO Office Complaint No.1H-366-0011-05, regarding the allegations of unlawful discrimination and retaliation when McCloud's two requests for light duty were denied. (Ex. 9).

## FACTUAL BACKGROUND

**A.     Plaintiff's Job When Hired and the Industrial Job Site Environment.**

4

15.     Kim R. McCloud applied for a job at the USPS's Mobile Processing and Distribution Center (herein, "Mobile P&DC"), was hired and on September 12, 1998, she entered on duty as a Mail Processing Clerk being assigned to Tour 3 (this tour has assigned the general routine from 4:00PM to 12:30AM).

16.     The job description and requirements of the Mail Processing Clerk are shown on Standard Position Description (Ex.10) and Bargaining Unit Qualification Standard (Ex.11).  Of particular note from Ex. 11, is the following excerpt:

### PHYSICAL REQUIREMENTS

Applicants must be physically able to efficiently perform the duties of the position, which require *arduous exertion* involving *prolonged standing*, *walking, bending, and reaching*, and may involve the *handling of heavy containers of mail and parcels weighing up to 70 pounds*.

17.     Plaintiff agrees the job description and qualification standards accurately describe the arduous physical requirements encountered as a Mail Processing Clerk. (Depo, p. 300, lines 6-18).

18.     The Mobile P&DC is located at 4538 Shipyard Road in Theodore, Alabama, and is an enormous industrial processing facility of approximately 100,000 square feet.  It operates 24 hours per day, 7 days per week, all the year round.  The Mobile P&DC receives, sorts, processes and distributes on the average of 1,000,000 pieces of mail per day.  There are approximately 300 personnel members over 3 shifts (or "tours") per day to perform manual labor and to operate a variety of equipment, automation, planning and

sequencing of receiving, distribution and processing mail. (Declaration of Earl Watson, [¶ 1].

**B.     Union Membership and Union Representation.**

19.     Non-management Employees at Mobile P&DC are represented by two unions, the National Mail Handlers Union and the American Postal Workers Union ("APWU"). Plaintiff has been a member of the APWU during the time relevant to her Complaint.  A contract exists between the Union on behalf of the employees and the USPS ("the contract").

20.     If a union member believes they have grounds for a dispute with the USPS management, the employee-member is represented through the grievance process by union stewards or officers.  The grievance process begins with a complaint which should allege a violation of contract requirements and continues through a Step 1 hearing, a Step 2 hearing, and if still unresolved, it goes to binding arbitration.  Employees are rarely present when their union representatives meet with USPS representatives over contract interpretation, offering of proof, or argument.

21.     Disagreements over union contract disputes, interpretations or employee grievances based on the contract are not involved in the EEO process and are not issues involved in this lawsuit.  (Ex. 5, Defendant's Request for Admissions, No. 12; Ex. 4, Plaintiff's Admission Response No. 12).

22.     The settlement and payment of a grievance (union grievance #055-05; USPS #HOOC-4H-C05112397) for back-pay is also duplicated in its entirety in an EEO

6

Complaint which is the remaining issue before this Court.  Defendant satisfied the monetary claim. (Doc. 13, Defendant's Answer, ¶G, Affirmative Defenses of Settlement, Payment; Ex. 5, Defendant's Request for Admissions, No. 8; Ex. 4, Plaintiff's Admission Response No. 8).

**C.    *Obligatory* LIMITED Duty for Job-Related Injury; *Discretionary* LIGHT Duty Assignments for Other Illness or Injury Off-the-Job.**

**LIMITED Duty a matter of right for employees injured on-the-job.**

23.    LIMITED Duty is a phrase used to define work for employees who have sustained an on-the-job injury while on official duty for the USPS. For the period of time relevant to McCloud's claims, LIMITED Duty assignments for the Mobile P&DC were coordinated through the Injury Compensation (Worker's Compensation) Office in downtown Mobile, Alabama, which is managed by Mr. Bill Johnston, Injury Compensation Specialist. (Declaration of William "Bill" R. Johnston [¶1]).

24.    On August 20, 2004, McCloud alleged an on-the-job injury which she claimed occurred in <u>1999</u> at the Mobile P&DC.  As required by postal regulation, she was offered an assignment of LIMITED duty on September 1, 2004, which she accepted on September 7, 2004. (Ex. 12).

25.    Plaintiff worked according to this LIMITED Duty until her claim for work-related injury causation was denied, whereupon any obligation of the USPS to offer Limited Duty ended.  (Ex. 13).

26.     On January 3, 2005, Bill Johnston wrote to Plaintiff explaining the recent denial of her claim for work-related injury causation and alerting that she was no longer entitled to work under LIMITED Duty.  He explained McCloud's option to voluntarily request a LIGHT Duty Assignment (Johnston Declaration, ¶3) and he included such a form for Plaintiff to consider.

27.     Within days of this letter which explained LIMITED Duty had ended, McCloud alleged she sustained another on-the-job injury on January 19, 2005. (Johnston Declaration, ¶3). On March 7, 2005, Plaintiff was sent a letter by OWCP which informed her that this most recent claim of job-related injury (January 19, 2005) had been denied due to lack of causation. (Ex. 14; Johnston Declaration, ¶¶ 3-4).

28.     McCloud knew her LIMITED Duty assignment had again ended when she received the letter dated March 7, 2005.

### *Discretionary* LIGHT Duty for Illness or Injury <u>Not</u> Job-Related.

29.     Employees who are recovering from an illness or accident not related to their employment with the USPS may voluntarily request LIGHT duty by submitting the approved form completed and signed by the employee's treating physician or chiropractor **and** the employee. (Johnston Declaration, ¶4; Watson Declaration, ¶2).

30.     The Mobile P&DC has a standard, objective policy and requirement that every employee must be able to lift at least 20 pounds in order to be ***considered*** for light duty.  Light duty is not guaranteed.  (Ex. 15, ¶2).

31.     Because LIGHT duty is discretionary, USPS management has a variety of rights and obligations in the contracts between it and the unions.  Specifically, in regard to the issue of finding work, if possible, for those employees who voluntarily request LIGHT duty assignments, the USPS clearly retains fundamental rights to manage, staff, sequence and  process its 1,000,000 pieces of mail per day:

A.     To direct employees of the Employer in the performance of official duties;
B.     To hire, promote, transfer, assign, and retain employees in positions with the Postal Service and to suspend, demote, discharge, or take other disciplinary action against such employees;
C.     To maintain the efficiency of the operations entrusted to it;
D.     To determine the methods, means, and personnel by which such operations are to be conducted;

(Ex. 16, Agreement between United States Postal Service and American Postal Workers Union, AFL-CIO ["The Contract"], Art. 3.)

32.     Article 13.2.A of the Contract provides:  "Any full-time regular . . . employee recuperating from a serious illness or injury and temporarily unable to perform the assigned duties may voluntarily submit a written request to the installation head for temporary assignment to a light duty or other assignment.  The request shall be supported by a medical statement from a licensed physician or by a written statement from a licensed chiropractor stating, when possible, the anticipated duration of the convalescence period. . . ." (Ex. 16).

33.     LIGHT duty work is not guaranteed to any USPS employee.  Section § 355 Light.14 of the ELM states:  "The light duty provisions of the various collective bargaining agreements between the U.S. Postal Service and the postal unions do not

guarantee any employee who is on a light duty assignment any number of hours of work per day or per week."  (Ex.17).

34.     Section § 355.13 of the ELM provides "[The Plant Managers or] Installation Heads show the greatest consideration for full-time regular or part-time flexible employees requiring light duty or other assignments, giving each request careful attention, and reassign such employees to the extent possible in the employee's office."  (Ex. 17).

35.     Article 13.2.C of the Contract provides:  "Installation Heads [plant managers] shall show the greatest consideration for full-time regular or part-time flexible employees requiring light duty or other assignments, giving each request careful attention, and reassign such employees to the extent possible in the employee's office.  When a request is refused, the installation head [plant manager] shall notify the concerned employee in writing, stating the reasons for the inability to reassign the employee."  (Ex. 16).

36.     Article 13.4.D of the Contract provides:  "The reassignment of a full-time regular . . . employee . . . to an agreed-upon light duty temporary . . . assignment . . . will be the decision of the installation head [plant manager] who will be guided by the examining physicians's report, employee's ability to reach the place of employment and ability to perform the duties involved."  (Ex. 16).

37.     Article 13.4.F of the Contract provides:  "The installation head shall review each light duty reassignment at least once each year, or at any time the installation head

10

has reason to believe the incumbent is able to perform satisfactorily in other than the light duty assignment the employee occupies."  (Ex. 16).

38.     Granting light duty requests is within the discretion of the USPS management and employees have no guarantee of the approval of light duty requests.  The Plant Manager has the right and obligation to review requests for light duty frequently to determine whether employees are qualified and whether there is discretionary work for them to do.  (Ex. 16, The Contract, Art. 13; Hall Declaration, ¶¶ 2, 8).

39.     McCloud very clearly knew she must be able to lift at least 20 pounds to be considered for LIGHT Duty.  She became aware of this widely known plant policy and requirement at least as early as December 3, 2003, when she presented a RFLD to supervisor Earl Watson which contained a chiropractic-doctor's fifteen (15) pound limit on her lifting. (Ex. 18, form completed by Dr. Jessica Seematter as Plaintiff <u>first</u> received it).  According to her deposition testimony, Plaintiff was informed by Earl Watson on December 3, 2003, that for any RFLD to be considered, she must be able to lift at least 20 pounds.  (Depo, p. 171, lines 9-12; p. 173, lines 7-12).

40.     McCloud returned to her chiropractic doctor, Dr. Seematter, on or about December 3, 2003, and informed the doctor of this widely known plant policy and requirement of 20 pound minimum lifting limit. (Depo, p.170, lines 1-5; p. 171, lines 9-23; p. 172, lines 1-4).

41.     According to McCloud's sworn testimony, it was Dr. Seematter who revised or altered the lift limit in the RFLD at McCloud's request and presumably after re-

11

evaluation (the form had been dated originally by Dr. Seematter on November 24, 2003, and later by Plaintiff on December 3, 2003), to now read a new higher limit of "20" pounds for a maximum lifting limit. This alteration can be easily discerned by an examination of the numbers "20" imposed directly over the numbers "15" in the blank for the lifting limit.  (Ex. 19 and Ex. 18).

42.     On or about December 3, 2003, the revised RFLD showing 20 pounds limit was re-submitted to Earl Watson for consideration.   There was work available at Mobile P&DC within this limitation, so Earl Watson approved light duty. (Ex. 19).

43.     McCloud admits receiving, reading and understanding a letter dated January 28, 2004, from Earl Watson which detailed the minimum requirements for those employees seeking to work LIGHT duty assignments.  (Ex. 20; Depo, p.115, lines 10-14; p.184, lines 15-23, p.185, lines 1-5).  This letter included, but is not limited to, the clear and unambiguous requirement that employees must be able to lift up to 20 pounds to be considered for any LIGHT duty assignment.  (Ex. 20).

44.     In her deposition testimony, McCloud admits and confirms that the Mobile P&DC's policy, regulation and requirement of being able to lift up to 20 pounds is a requirement of all employees seeking to submit a RFLD and, further, that the requirement is widely known by employees at the Mobile P&DC. (Ex. 15, ¶2; Depo, p.140, lines 12-18; p.172, lines 8-13; p.185, lines 13-18).

**D.     After Two Claims for On-the-Job Injury Are Denied and the LIMITED Duty Assignments had ended, Plaintiff requests LIGHT Duty Assignments for iIlness or <u>injury not job-related.</u>**

### McCloud's March 14, 2005 RFLD.

45.    On March 14, 2005, only days following the denial of her second on-the-job injury claim – and the end of her LIMITED Duty – McCloud presented a RFLD to "acting" manager Tammy Estes, who was filling in for Earl Watson.  The RFLD contained a fifteen (15) pound lifting limit from Dr. Seematter.[1]  (Ex. 21).

46.    On and before March 14, 2005, McCloud clearly knew Mobile P&DC's policy and regulation that any employee who requests a LIGHT duty assignment must be able to lift up to 20 pounds to be considered.  (Depo, p. 115, lines 10-14; p. 140, lines 12-18; p. 184, lines 15-23, p. 185, lines 1-5; p. 172, lines 8-13; p. 185, lines 13-18; Ex. 20; Ex. 15, ¶2).

47.    As Tammy Estes was only an "acting" manager of operations, she informed McCloud that she could not deny or approve any RFLD and that the matter must be submitted to Earl Watson the usual manager for the Tour 3, or to Joel Hall, the plant manager. (Ex. 22, pp. 1-2).

48.    McCloud agreed that "acting" managers do not have the same, full range of delegated authority that the usual managers would in responding to a RFLD or other issues.  (Depo, p. 257, lines 17-23; p. 258, lines 21-23; p. 259, lines 1).

---

[1]This is the very same Dr. Jessica Seematter who is said by McCloud to have revised the earlier 15 pound limit to be 20 pounds in the December 3, 2003 RFLD.  (Ex. 19 and Depo, p.170, lines 1- 5; p.171, lines 9-21; p. 172, lines 2-4; p. 174, lines 9-16; p. 184, lines 4-14.)

49.     On March 14, 2005, Tammy Estes contacted the usual manager of Tour 3, Earl Watson, who verbally denied McCloud's RFLD with the 15 pound lift limitation. Due to the 15 pound limitation, Defendant had a legitimate, non-discriminatory reason for denial.

50.     Earl Watson is an African-American male.  (Watson Declaration, ¶1).

51.     On or about March 29, 2005, plant manager/installation head Joel Hall provided a written denial of McCloud's RFLD, due to the RFLD containing a 15 pound lift limitation, despite the minimum lifting requirement being that USPS employee must be able to lift at least 20 pounds for LIGHT duty.  This is a legitimate, non-discriminatory reason for the denial. (Ex. 1 and Ex.15, ¶ 2).

52.     Joel Hall is an African-American male.  (Hall Declaration, ¶1).

53.     McCloud received this March 29, 2005, letter on or about April 1, 2005. (Depo, p.157, lines 5-12; p. 161, line 23; p. 162, lines 1-5; p. 163, lines 17-19; p. 167, lines 7-11; p. 234, lines 14-17).

54.     The substantive reason provided in the March 29, 2005, letter from Joel Hall denying the RFLD was completely consistent with the same legitimate reasoning provided in the letter from Earl Watson to McCloud dated January 28, 2004. (Ex. 20).  The March 29, 2005 denial letter contained the same minimum lifting requirement of 20 pounds. (Ex. 1).  The employee received a reasonable, rationale, business-based reason for the denial decision. (Ex 16, The Contract, Art. 13 and Ex. 15, ¶2).

55.     On March 22, 2005, prior to receiving a decision on her RFLD, McCloud demanded the union file a grievance on her behalf.  The union grievance number was 023-05 (USPS number HOOC-1H-C05090989).  Having made its way through the proper step by step grievance process, on January 27, 2006, the grievance was denied in its entirety and no recovery was provided to McCloud as a result of the USPS denial of McCloud's March 14, 2005, RFLD because of the 15 pound lifting limit. (Ex. 23).  The grievance did not include any complaint about any other RFLD.  (Ex. 23).

### McCloud's May 3, 2005, RFLD.

56.     Plaintiff did not return to the USPS for work until May 3, 2005, when she submitted a different RFLD, with a lift limit of 20 pounds.  As with the March 14, 2005, RFLD, Dr. Seematter had also addressed other physical limitations.  (Ex. 24).

57.     Dr. Bendt Petersen, an orthopedic surgeon, also submitted evaluations about McCloud.  (Ex. 25).

58.     Joel Hall, the plant manager/installation head, expressed concern over what he considered to be conflicting, or at least confusing, prognoses or predictions about McCloud's limitations and capabilities, the expected length of time for these restrictions, and even the contradictions in previous RFLDs which predicted how long those conditions would last.  (Ex. 2).

59.     The March 14, 2005 RFLD medical portion from Dr. Seematter gave a prognosis that the conditions would last 4 months. (Ex. 21).  Less than one and a half

months later, the conditions prognosed to last for 4 months, had markedly changed. (Ex. 24).

60.    In a letter dated May 11, 2005, Joel Hall denied the May 3, 2005, RFLD and gave his written reasoning that the medical information provided to him was, at least to him, confusing or contradictory, and that he was unwilling to risk injury to McCloud or liability to the USPS by granting her RFLD.  (Ex. 2).

61.    Pursuant to Article 13 of the Contract (Ex. 16 and pp. 9-11, *supra*) and the ELM (Ex. 17 and p. 10, *supra*), as installation head, Joel Hall had the duty and the right to review any and all RFLDs and consider the past doctor reports, their prognoses, etc. when making the decsion to deny or approve this RFLD.

62.    Hall provided a legitimate business rationale for his decision, (Hall Declaration, ¶¶ 5-8), and mentioned in his letter that he was completely open to revisiting the issue if the confusion was cleared up or McCloud's restrictions changed. (Ex. 2; Hall Declaration, ¶¶ 8, 9 and 11; Declaration of Albert Ward [¶ 8]).

63.    On May 20, 2005, before providing any medical information to help clarify the situation, McCloud began the union grievance process again on May 20, 2005.

64.    In this grievance, the union alleged a violation of the contract when Joel Hall denied the May 3, 2005, RFLD.  The union grievance number was 055-05 (USPS number HOOC-4H-C05112397).  At Step 2 of the Grievance Process, the grievance was denied on May 27, 2005. (Ex. 26).  On June 14, 2005, the Step 2 process meeting was conducted and on June 24, 2005, the grievance was again denied.  (Ex. 27).

65.     As described by Al Ward this additional information received from Dr. Seematter was helpful in clearing up the confusion and seeming contradictions.  (Ex. 28, Ward Declaration,¶8).  It was the additional medical information requested by Joel Hall in his May 11th letter (Ex. 2).  Upon receipt of this additional information, a bilateral settlement was reached on or about July 19, 2005 between the union and USPS representatives which allowed McCloud could return to work under light duty and to receive back-pay from May 4, 2005, until the date she returned to work.  (Ex. 29).

66.     Defendant fully and completely paid McCloud's back-pay as agreed in the bilateral settlement and she was also provided her annual leave (vacation) which would have accrued during that time, even though not agreed to in the settlement. (Ex. 5, Defendant's Request for Admission No. 8; Ex. 4, Plaintiff's Response No. 8; Depo, p. 254, lines 14-20; p. 307, lines 4-6; and, Doc. 13, Defendant's Answer, Affirmative Defenses, ¶G).

## McCloud's alleged March 31, 2005 RFLD:

### Never received by USPS, nor is any Claim included in any EEO complaint or Grievance.

67.     Though not apparent from the Complaint (Doc. 1), McCloud has at times alleged that she submitted another RFLD on March 31, 2005.  Presumably to prove she submitted such a RFLD, McCloud claimed she sent this alleged March 31, 2005, RFLD to Plant Manager Joel Hall **by certified mail.**  (Ex. 30, p. 2 of Investigative Affidavit).

68.     To date, Plaintiff has not provided any such evidence.  (Ex. 3, Interrogatories 3 and 4, and Ex. 33, Requests for Production 3 and 4).

69.     The only record Mobile P&DC has of McCloud's presence at the plant during the entire month of March 2005 shows her coming and going only on March 14, 2005.  (Ward Declaration,¶ 7).

70.     In her deposition, McCloud altered her story by saying she gained access to the Mobile P&DC by using her common-law husband's electronic pass-key to gain entrance to the plant and leave this alleged RFLD for Joel Hall to find (Horace Simmons is also an employee at Mobile P&DC)(Depo, p. 143, lines 1-23; p. 242, lines 10-21; p. 243, lines 10-19).

71.     There is no record in the USPS files or records that McCloud ever submitted a RFLD on or about March 31, 2005.  (Ward Declaration,¶7).

72.     Plant Manager Joel Hall denied receiving any RFLD dated March 31, 2005, whether signed by the doctor only, or signed by the doctor and the employee, as required for a request to be considered.  (Hall Declaration,¶10).

73.     Dr. Seematter's patient file on McCloud does not reflect an office visit by McCloud on or about March 31, 2005, nor any billing for any services rendered on or about March 31, 2005.  (Depo, p. 180, lines 9-15; p. 181, lines 7-18; p.182, lines 1-16; Ex. 31).

74.     During the Step 2 process of Union Grievance No. 023-05 and USPS No. HOOC-1H-C05090989, a union representative showed USPS representative (Al Ward) a

copy of the RFLD which had been ostensibly completed by Dr. Seematter but which had

**not been signed or dated by McCloud**, (Depo, p. 236, lines 18-23; p. 237, lines 1-14; p.

241, lines 1-6), and this was the first time anyone from the USPS had ever seen even an

unsigned, undated copy of the alleged RFLD. (Ex. 32; Hall Declaration,¶10; Ward

Declaration,¶ 7).

75.    During her deposition testimony, McCloud agreed the union representative

showed  Al Ward the incomplete RFLD which was neither signed nor dated by her.

(Depo, p. 237, lines 3-14; Ex. 32, Ward Declaration,¶7).

**McCloud did not file any Union Grievance or EEO Complaint involving
this alleged March 31, 2005 RFLD and therefore has not exhausted her
administrative remedies.**

76.    The Union Grievance No. 023-05 (USPS No. HOOC-1H-C05090989),

concerned only whether the USPS acted properly in the denial of the light duty request by

McCloud which denials occurred on March 14, 2005 (verbal) and March 29, 2005 (written

letter). (Ex. 34).

77.    McCloud filed a complaint, 1H-366-0011-05, with the EEO Office of the

USPS, on or about June 6, 2005, alleging unlawful discrimination in the denials of her

March 14, 2005, RFLD and her May 3, 2005, RFLD.  (Ex. 35).

78.    On June 30, 2005, the EEO Office issued an Order entitled "Partial

Acceptance/Partial Dismissal of Formal EEO Complaint" in which McCloud was

informed that a portion of her complaint had been accepted for investigation.  The specific

claims accepted for investigation included, and were expressly limited to, the following:

"On March 14, 2005, March 29, 2005, and May 11, 2005, your requests for light duty were denied." (Ex. 36).

79.    Neither McCloud nor her legal counsel objected to the terms of this Order, which is conclusive evidence that no March 31, 2005, RFLD was ever submitted.  (Depo, p. 229, lines 7-23; p. 230, lines 7-21).

80.    On January 6, 2006, the EEO issued a Final Agency Decision regarding the allegations of unlawful discrimination when McCloud's requests for light duty were denied by the agency on "March 14, 2005, March 29, 2005 and May 11, 2005."  (Depo, p. 231, lines 13-23; p. 232, lines 1-13; Ex. 9, p. 1).

81.    In McCloud's Complaint (Doc. 1, ¶ 13), she alleges that the USPS erred and discriminated against her when her requests for light duty were denied on "March 14, 2005, March 29, 2005 and May 11, 2005." More conclusive proof that a March 31, 2005, RFLD was not included.

82.    McCloud has never filed an administrative EEO complaint involving any action on her alleged March 31, 2005 RFLD, neither has any union grievance ever been filed on behalf of McCloud for it. Her civil action is based solely on two RFLDs: one on March 14, 2005 (verbally denied on the same day and in writing on the 29th of March) and on May 3, 2005 (denied in writing on May 11, 2005).

83.    Consequently, McCloud has not exhausted her administrative remedies for a March 31, 2005, RFLD, even if she ever presented a properly completed one. (Doc. 13, Defendant's Answer and Affirmative Defenses, ¶A).  The claim is barred.

20

**E.**   **Dismissal with Prejudice of Major Issue in pending Civil Action.**

84.   McCloud's discovery response affirms the issues in her Complaint are limited to those issues submitted and accepted in her two EEO complaints, namely No. 1H-366-0011-05 filed on June 6, 2005 and No. 1H-366-0006-06 filed on December 9, 2005.  (Ex. 3, Defendant's Interrogatory, No. 1; Ex. 4, Plaintiff's Response No. 1).

85.   In McCloud's EEO No. 1H-366-0006-06, she claimed unlawful discrimination in the slow or late payment of the bilateral pre-arbitration settlement of the union grievance number  055-05 and USPS number HOOC-4H-C05112397.  For this claim, she demanded back-pay according to the settlement, and $75,000 for compensatory damages for emotional distress and mental anguish, and attorney's fees incurred.  (Ex. 37, EEO Complaint No. 1H-366-0006-06, p. 1).

86.   During her deposition upon oral examination on March 9, 2007, Plaintiff realized for the first time she had misunderstood the facts:  the two women (Tammy Parker and A.L. "Linda" Hudson) Plaintiff believed received better treatment, had in actual fact received lump-sum settlements, thus their settlement payments were easily made. McCloud's back-pay grievance settlement was far from a lump-sum, liquidated amount: it involved a painstaking review of 14 weeks (7 pay periods), with great attention to night time differentials, holiday premium pay, requirement for supporting documents from Alabama Unemployment Compensation Office, etc. (Depo, p. 69, lines 4-23; p. 70; p. 74, lines 6-10; p. 84, lines 16-23; p. 85; p. 86, lines 1-9).

21

87.     Defendant requested and Plaintiff agreed to a dismissal of all issues, claims, rights and damages that arose out of the allegations in her EEO No. 1H-366-0006-06.  The joint stipulation for dismissal was filed on March 16, 2007, dismissing all such issues, claims, rights and damages from this EEO claim. (Doc. 21; Depo, p. 106, lines 5-23; p. 107, lines 1-4).  No settlement was involved: no money, nor action or inaction was promised by Defendant.

**F.     McCloud Misunderstood That Her Fellow Employees Were on LIMITED Duty, Rather than LIGHT Duty.**

88.     The other Mobile P&DC comparator employees Plaintiff identified as having lighter or lower lift limits than her were <u>not</u> on LIGHT duty assignments. Rather, they were on obligatory LIMITED duty, thus subject to the worker's compensation laws and requirements of the USPS.  Declaration of William "Bill" R. Johnston.

89.     Many of these claimed comparators are not even in the same craft or job classification or union.  Accordingly, these employees are not in the same circumstance as McCloud who was seeking LIGHT Duty and therefore do not serve as legal comparators.

**G.     Contrary to Plaintiff's conclusory allegations, Management denied Light Duty requests from other employees with lift limits below 20 pounds.**

90.     McCloud has alleged several Mobile P&DC employees were allowed to work on LIGHT duty with less than 20 pound lift limits, however these employees were also denied LIGHT duty when their lifting limits were less than twenty (20) pounds.

22

(Ward Declaration,¶16).  Many of these alleged comparators are not even in the same craft or job classification or union.

91.     As learned in the Declarations of Johnston and Watson, all those who requested light duty with doctor-imposed lifting limits below 20 pounds were denied: all African-Americans, all males, all females, all Caucasians.  Of those with limits of 20 pounds who were denied, Patti Anglin (female, Caucasian) was denied with a lift limit of 20 pounds when the other doctor-imposed restrictions were considered, exactly as was McCloud on May 11, 2005.  (Watson Declaration).

92.     Accordingly, these employees are not comparators with McCloud for their requests for LIGHT duty with lift limits below 20 pounds, or for some other doctor restricted reason.


**H.     McCloud is not a Qualified Individual with a Disability.**

**McCloud cannot perform her Mail Processing Clerk job now, nor since at least the dates she claims discrimination beginning in 2005.**

93.     McCloud fully agrees that the Standard Position Description (Ex. 10) and Bargaining Unit Qualification Standard (Ex. 11) accurately defined the job requirements of the Mail Processing Clerk which were actually required in the daily performance of her job as Mail Processing Clerk. (Depo, p. 300, lines 4-18).

94.     Plaintiff alleges in her Complaint at ¶¶ 12 and 14 (Doc. 1), that she is capable of performing her job of Mail Processing Clerk, with or without accommodations.

95.    In deposition testimony, McCloud provides clear and convincing evidence that she cannot perform that job now, nor has she since at least before the time she alleges unlawful discrimination in March 2005.

96.    McCloud's job while on a LIGHT duty assignment is to "case mail" also known as "stick letters" (Ex. 3, Defendant's Interrogatory 8 and Ex. 4, Plaintiff's Answer 8; Depo, p.136, lines 9-12; p. 211, lines 5-11; p. 286, lines 6-16).

97.    Plaintiff's LIGHT duty assignment during the relevant period involved occasionally walking only 6-8 feet away from her chair and work station, picking up a small, low-profile tray which weighed 20 pounds or less, then sort that loose mail into the "pigeon hole" type slots.  Following that process, she would move that sorted mail back to trays located on a rack just a few feet behind her. (Depo, p. 128, line 5 through p. 132, line 17, inclusive; see also, Ex. 38 [photographs of her work station and chair she is allowed to use, Depo, p. 124, lines 10-17; p. 126, lines 1-10]).  For this LIGHT duty work, she is paid approximately $45,000 per year. (Depo, p. 285, line 21 through p. 286, line 3, inclusive).

98.    According to McCloud, from at least March 14, 2005, March 29, 2005 and May 11, 2005 through the present, she has not been able to perform her duties as a Mail Processing Clerk which she was hired to perform.  (Depo, p. 288, lines5-15; p. 290, lines 9-15; p. 296, lines 2-9; p. 297; p. 298, lines 1-20; p. 299, lines 1-19; p. 300, lines 1-3; p. 302, lines 9-15).

99.    She has not been able "to lift the required 70 pound items on occasion" to perform her duties as the Mail Processing Clerk which she was hired to perform.  (Depo,

p. 296, lines 12-9, 21-23; p. 297, line 1).

100.   She has also not been able "to bend" to perform her duties as the Mail Processing Clerk which she was hired to perform.  (Depo, p. 297, lines 2-9).

101.   She has not been able "to twist" to perform her duties as the Mail Processing Clerk which she was hired to perform. (Depo, p. 297, lines 10-20).

102.   She has not been able "to reach" to perform her duties as the Mail Processing Clerk which she was hired to perform.  (Depo, p. 297, lines21-23 through p. 298, lines 1-20).

103.   She cannot "stand" to perform her duties as the Mail Processing Clerk which she was hired to perform. (Depo, p. 298, lines 15-20).

104.   Proving she has a typical life experience without any substantial limitation to any major life function or activity, McCloud states she can hear without the aid of any hearing device. (Depo, p. 267, lines 14-22).

105.   She is able to see with the aid of corrective lenses. (Depo, p. 267, lines 9-13).

106.   She is able to walk without the aid of any walker, cane or crutch and wears no neck brace.  (Depo, p. 255, lines 9-23).

107.   According to McCloud, she is able to go about a normal existence away from the Mobile P&DC without severe restriction caused by any physical condition, and has been since at least March 14, 2005.  (Depo, p. 279, lines 2-7).

108.   McCloud goes shopping several times per week without difficulty, and has

25

been able to do so since at least March 14, 2005.  (Depo, p. 263, lines 1-2, 19-23 through p. 264, lines 1-3).

109.    She drives her own automobile approximately 20 minutes (40 minutes round-trip) to a neighboring city to visit her mother approximately three times per week without difficulty, and has been able to do so since at least March 14, 2005.  (Depo, p. 274, lines 17-23 through p. 275, lines 1-6).

110.    She dines out with her family 2 or 3 times per week without difficulty, and has been able to do so since at least March 14, 2005, often driving the family herself. (Depo, p. 274, lines 1-16).

111.    McCloud regularly attends church services at a church located approximately 20 minutes automobile drive away from her house without difficulty, and has been able to do so since at least March 14, 2005.  (Depo, p. 263, lines 5-6; p. 280, lines 19-23 through p. 281, lines 1-10; p. 283, lines 1-16).

112.    McCloud drives herself to work daily without difficulty, and has been able to do so since at least March 14, 2005.  (Depo, p. 262, lines 22-23).

113.    She dresses herself without difficulty, and has been able to do so since at least March 14, 2005.  (Depo, p. 268, lines 1-11).

114.    She bathes herself daily and without difficulty. (Depo, p. 268, lines 12-16).

115.    She cooks the family meals daily without difficulty.  (Depo, p. 265, lines 13-14) .

**Plaintiff mistakenly demands an accommodation to help in her LIGHT**

**duty assignment, which is offered at the discretion of the USPS.**

116.    As shown, rather than asking for "accommodations" to work the job of Mail Processing Clerk for which she was hired, Plaintiff has by clear and convincing evidence admitted, in super-numerous instances, that she has not been able to perform the requirements of Mail Processing Clerk for quite some time, even pre-dating the time she is claiming the alleged unlawful discrimination.

117.    As shown in her deposition testimony, Plaintiff is asking for "accommodations" so that she may work discretionary LIGHT duty the USPS is under no obligation to provide to her.

> **Even if Plaintiff were not mistaken in her demands for an accommodation for LIGHT duty assignment, she has been allowed to use a chair and has a 20 pound lifting limit.**

118.    The USPS is under no obligation to provide LIGHT Duty, and even though Plaintiff has plainly proven in her own testimony she cannot perform the work of a Mail Processing Clerk, Plaintiff has received the benefit of the very things she complained she was entitled to: namely, she has used a high back chair since she returned to work in August or September 2005 (Depo, p. 253, lines 6-16; p. 254, lines 3-13; pp. 301, line 21 through p. 303 line 16, inclusive; p. 133, lines17-23, p. 134; p.135, lines 1-3;  Watson Declaration, ¶ 21; Ex. 38), and she has been working under a LIGHT duty assignment with a 20 pound limit for lifting. (Ward Declaration,¶ 7).

119.    She has been completely paid for her back-pay settlement (Ex. 5, Defendant's Request for Admissions No. 8; Ex. 4, Plaintiff's Responses No. 8)

27

**I.    There has been no retaliation against Plaintiff for a previous EEO Complaint**.

120.    McCloud's previous informal EEO activity mentioned in the Complaint (Doc. 1, ¶ 13) was identified in discovery to be EEO No. 4H-350-0080-04.  McCloud informally claimed that "Acting" Plant Manager Robert Johnson denied her a "hardship transfer" to a daytime shift because or race and gender discrimination.  (Ex. 39).

121.    Despite her relatively short time with the USPS at this processing plant which utilizes approximately 300 employees, this was not her first request for a daytime shift. (Ex. 40).

122.    Plaintiff even went the extreme as to tell her employer that she was on probation for child abuse.  (Ex. 41).   This was later shown to be false.  (Ex. 42).

123.    Those requests were denied and legitimate business reasons were given to Plaintiff. In her informal EEO matter she alleged that Robert Johnson had discriminated against her by denying her request for a hardship change of schedule in March 2004.  The case was settled at mediation without any formal complaint ever being filed.  The settlement agreement, signed by plaintiff and Robert Johnson, provided that plaintiff would write to the Manager of Post Office Operations and Postmaster requesting a change of schedule and reassignment to station, and Robert Johnson would do everything he could to assist plaintiff.  No particular result was asked or promised. (Ex. 43).

124.    Plaintiff has produced no evidence in her deposition nor in her answers to discovery nor elsewhere as to why Earl Watson or Joel Hall would retaliate or discriminate against her for the informal matter she raised with Robert Johnson years previously.

125.    There is no evidence that Earl Watson or Joel Hall even knew of this informal matter or incident and both deny any knowledge. (Ex. 44, Hall Investigative Affidavit, Questions 10-12 on p. 2 and Answers on p. 5; Ex. 45, Watson Investigative Affidavit, Questions 10-12 on p. 2 and Answers on p. 5).

126.    The only hint Plaintiff offers when asked directly about the issue is to obliquely point to a single page memo by Earl Watson who was writing in support of the agency decision to controvert one of Plaintiff's workers compensation claims.  (Depo, p. 199, lines 5-18).  In January 24, 2005, Earl Watson wrote what he believed to have happened on the alleged injury date of January 19, 2005 and the circumstances surrounding the event:  Plaintiff continuing working  following this alleged injury, the curious absence of any eye-witnesses, and that Plaintiff may have been claiming this second injury in response to the recent denial of an earlier alleged work-related injury. (Ex. 46; Watson Declaration, ¶ 8).

127.    The USPS has the full right and fiscal responsibility to respond to claims of work-related injury, especially those which might appear specious when coincidentally happening right after the denial of another claim for work-related injury.

128.    Because a full year passed between the EEO informal matter (it did not rise to a complaint status) claim filed in March 2004 and the denial of a request for light duty in March 2005 no inference of retaliatory motive can be drawn.

## CONCLUSIONS OF LAW

**A.    Standard of Review.**

1.    The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. Rule. Civ. P. 56©); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).

2.    When faced with a motion for summary judgment, the non-movant bears the burden of coming forward with sufficient evidence that proves every element of a claim on which such non-movant has the burden of proof.  *See*, *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986);  *Celotex*, 477 U.S. at 317.  As the Court recently stated in issuing summary judgment in favor of the Postal Service, once the initial burden is met by the movant, the non-moving party must make a sufficient showing.

> The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats &*

> *Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has
> satisfied its responsibility, the burden shifts to the nonmovant to show the
> existence of a genuine issue of material fact. *Id.* "If the nonmoving party
> fails to makes 'a sufficient showing on an essential element of her case with
> respect to which she has the burden of proof, 'the moving party is entitled to
> summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317
> (1986)(footnote omitted). "In reviewing whether the nonmoving party has
> met its burden, the court must stop short of weighing the evidence and
> making credibility determination of the truth of the matter. Instead, the
> evidence of the non-movant is to be believed, and all justifiable inferences
> are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d
> 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).

*Morris v. Potter*, C.A. 06-0414-KD-M, *7 (S.D. Ala. Mar. 8, 2007)(copy attached to

Defendant's Brief).

3.      The "mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment . . . . [o]nly

factual disputes that are material under the substantive law governing the case will

preclude entry of summary judgment." *Lofton v. Secretary of Dep't of Children and*

*Family Services*, 358 F.3d 804, 809 (11th Cir. 2004)(citations omitted).

4.      The Eleventh Circuit has expressly rejected the notion that summary

judgment cannot be used in employment discrimination cases because such cases may

involve issues of motivation and intent. *See*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079

(11th Cir. 2004).

**B.      Race and Gender Discrimination Claim**

5.      Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights

Act of 1991 (Act), 42 U.S.C. § 2000e-16(c), provides the sole basis for jurisdiction and the

exclusive judicial remedy for Plaintiff's claims of race, gender, and reprisal
discrimination.  Title VII is the exclusive remedy for race, gender, and reprisal
discrimination in federal employment.  *See*, *Doe v. Garrett*, 903 F.2d 1455, 1460 (11th
Cir. 1990).  It is now well settled, Title VII is the "exclusive, pre-emptive administrative
and judicial scheme for the redress of federal employment discrimination." *Newbold v.
United States Postal Service*, 614 F.2d 46, 47 (5th Cir. 1980), *quoting*, *Brown v. GSA*, 425
U.S. 820, 829 (1976)].  *See also*, *Ramey v. Bowsher*, 915 F.2d 731, 734 (D.C. Cir. 1990),
*cert. denied,* 499 U.S. 947 (1991); *Lamb v. United States Postal Service*, 852 F.2d 845,
846 (5th Cir. 1988); *White v. GSA*, 652 F.2d 913, 916-17 (9th Cir. 1981).

      6.      McCloud has offered, at best, conclusory allegations and no evidence.  The
Complaint (Doc. 1) reads in that fashion and following full discovery efforts, she has not
provided anything more than conclusory statements or assertions while at each step
increasing the number of supposed-comparators.  As the Eleventh Circuit stated
"conclusory allegations of discrimination, without more, are not sufficient to raise an
inference of pretext or intentional discrimination where employer has offered extensive
evidence of legitimate, nondiscriminatory reasons for its actions."  *Isenbergh v. Knight-
Ridder Newspaper Sales, Inc*., 97 F.3d 436, 443-444 (11th Cir. 1996); *see also*, *Mayfield v.
Patterson Pump Co.*, 101 F.3d 1371 (11th Cir. 1996); *Givhan v. Electronic Engineers,
Inc.*, 4 F. Supp.2d 1331, 1341 (M.D. Ala.1998)("Plaintiff has failed to offer any evidence,
other than general conclusory allegations, that he was treated differently than similarly
situated employees not in the protected class. . . . Accordingly, for this reason alone, the

court finds [the employer's] Motion for Summary Judgement is due to be granted."). *See also*, *Cooley v. Great Southern Wood Preserving*, 138 Fed.Appx.149 (11th Cir. 2005)(Shotgun pleading, conclusory allegations, plaintiff did not sufficiently identify the Title VII race discrimination claims, only generalized theories advanced.).

7.     The legal standard for analyzing a claim that one has been disparately treated in violation of Title VII is found in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  Plaintiff must establish a *prima facie* case.  If she does, the Defendant must articulate a legitimate nondiscriminatory reason for its action or he will lose the case. Thus, the burden shifts to the USPS to "'set forth, through the introduction of admissible evidence,' reasons for its action which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)(emphasis in original)(*quoting, Burdine*, 450 U.S. at 254-55).  Once the defendant has done so, "'the presumption raised by the *prima facie* case is rebutted,' and 'drops from the case.'" *Hicks*, 509 U.S. at 507 (citation omitted)(*quoting, Burdine*, 450 U.S. at 255 and n.10).  *Leslie v. Mobile Transit Authority*, 963 F. Supp. 1142, 1146 (S.D. Ala. 1977).

8.     The legal standard for analyzing a claim, not supported by direct proof,[2] that one has been disparately treated or intentionally discriminated against in violation of Title

---

[2]"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact [in issue] *without inference or presumption*.  [O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination."  *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted).

VII is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973) and

*Burdine*, 450 U.S. at 252-253.  To make out a *prima facie* case with regard to her claims of

race and gender discrimination, plaintiff must show she:  (1) is a member of a protected

class; (2) was qualified for the position; and, (3) employees outside her protected class

were treated more favorably than she was under similar circumstances.  *See also*, *Burke-*

*Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006), and *Roland v.*

*United States Postal Service*, 200 Fed. Appx. 868 (11th Cir. 2006).  The three step

allocation of proof for disparate treatment on the basis of race first elucidated in

*McDonnell Douglas*, 411 U.S. at 802, has been extended to encompass allegations of

discrimination based on gender.  *See e.g.*, *Walker v. Nationsbank of Florida N.A.*, 53 F.3d

1548, 1556 (11th Cir. 1995).

9.      A *prima facie* case must be established with "facts adequate to permit an

inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

From the written discovery efforts and the deposition, as if taking census Plaintiff has

listed more and more USPS employees she believes were treated more favorably than her.

McCloud is African-American and female and a member of the Clerk craft at Mobile

P&DC.  (Doc. 1, ¶ 7, 12).  However, those she identifies are also female and/or African-

American, male and African-American, female Caucasian but treated the same way with

denials of light duty, some are Mail Handlers, and the like.[3]  As shown in the Watson

---

[3]In *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980), the court held black males and white females are not within a black female's protected

Declaration and the Johnston Declaration, of those in the Clerk craft, all have been treated exactly equally in regard to whether the USPS granted light duty.

10.    To prevail, McCloud must establish comparator employees who are "similarly situated in all relevant respects."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th. Cir. 2004)(The comparator must be "nearly identical" to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer.).

11.    Even assuming McCloud could present a *prima facie* case – and she has not – the employer has articulated a legitimate non-discriminatory reason and rationale for having denied McCloud's RFLD.  The March 14, 2005 request was for less than the 20 pound minimum established by Mobile P&DC regulation.  (Ex. 15, ¶ 2).  The May 3, 2005 request denied on May 11th was based on the clear communication that the doctors' reports were conflicting and confusing, and inviting clarification from McCloud and/or her doctors. (Ex. 2; Hall Declaration, ¶¶ 5-8 and 11; Ward Declaration, ¶¶ 7-8).

12.    McCloud has failed to establish valid comparators and has presented no other circumstantial evidence suggesting racial or gender discrimination.  Even so, the Defendant through Joel Hall and Earl Watson have articulated legitimate and non-discriminatory reasons for their actions.  Which, as shown in the record, are evenly applied

---

class for purposes of her *prima facie* case. (*See*, *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc) for holding that prior Fifth Circuit cases apply in the Eleventh Circuit.

to all employees of the Mobile P&DC.  *See*, *Wright v. Sanders Lead Co., Inc.*, No. 06-12598, 2007 WL 489467 (Feb. 15, 2007) *5, and *Burke -Fowler*, 47 F.3d at 1325.

13.    To satisfy the third prong, Plaintiff must show she suffered an adverse employment action, which this Circuit has found to be "a serious and material change in the terms, conditions, or privileges of employment."  *Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1239 (11th Cir. 2001).  The Eleventh Circuit has found the following factors could make an employment action adverse: loss or reduction in pay, responsibility, prestige, or opportunities for professional growth, or advancement as viewed by the reasonable person.  *Doe v. Dekalb County School District*, 145 F.3d 1441, 1452 (11th Cir. 1998).

14.    McCloud's complaint is that she was not allowed light duty when and where she demanded it: light duty, as discussed and proven, *supra*, is a discretionary act of the USPS.  Thus, Plaintiff cannot establish either that the agency engaged in discriminatory conduct, or that she was aggrieved, or that any conduct on the part of the agency caused any alleged harm or loss with respect to a term, condition, or privilege of employment. Her claims must therefore be dismissed.

**C.    <u>Disability Discrimination Claim</u>**

15.    In order to establish a *prima facie* case of disability discrimination, Plaintiff must establish that she had an impairment that **substantially** limits a major life activity. *Toyota Motor Mfg. Kentucky v. Williams*, 534 U.S. 184, 194-95 (2002), *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)(citing 42 U.S.C. § 12102(2) and 34 C.F.R. §

36

104.3(j)(1)).  Although the ADA does not explicitly define the term "major life activity,"

we are guided by EEOC regulations. *See*, *Standard v. A.B.E.L. Servs*., 161 F.3d 1318,

1327 n.1 (11th Cir. 1998).  Under these regulations, working and walking are examples of

major life activities. 29 C.F.R. § 1630.2(I).  In general, "substantially limits" means the

inability to perform a major life activity as compared to the average person in the general

population or a significant restriction "as to the condition, manner or duration under which

an individual can perform" the particular activity.  *See*, *Hilburn v. Murata Elecs. N. Am.,*

Inc., 181 F.3d 1220, 1226 (11th Cir. 1999)(quoting 29 C.F.R. § 1630.2(j) (1)(I), (ii)).  An

individual has not shown that his or her ability is substantially limited if his or her

functioning is only "moderately below average." *Rossbach v. City of Miami*, 371 F.3d

1354, 1358 (11th Cir. 2004).

16.    For a condition to limit substantially a person's ability to work, the condition

must restrict the person's ability to perform either "a class of jobs or a broad range of jobs

in various classes as compared to the average person having comparable training, skill, and

abilities." 29 C.F.R. § 1630.2(j)(3)(I).  A person's inability to perform a single, particular

job does not constitute a substantial limitation in the major life activity of working. 29

C.F.R. §1630.2(j)(3)(I); *see also, Hilburn*, 181 F.3d at 1227.  This is so even if it is the

individual's job of choice. *Cash*, 231 F.3d at 1306.  She must also establish that she was a

qualified individual with a disability within the meaning of 29 C.F.R. § 1614.203(a)(6) at

the time of the alleged adverse action complained of. *Wimbley v. Bolger*, 642 F. Supp. 481,

485 (W.D. Tenn. 1986), *Jasany v. United States Postal Service*, 755 F.2d 1244 (6th Cir.

37

1985); 29 C.F.R. § 1630.4.   Title 42, United States Code, Section 12111(8) provides that the term "qualified individual with a disability" means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position held.  See 29 C.F.R. § 1630.2(m).  It is undisputed that Plaintiff could not perform the essential functions of her position.  That is why she requested light duty.  Therefore she was not a "qualified individual with a disability."

17.     In order to establish a *prima facie* case, plaintiff must demonstrate that she was "otherwise qualified" to do her job during the relevant time frame.  In the employment context, an otherwise qualified person is one who can perform "'the essential functions of the job in question with or without reasonable accommodation." 29 C.F.R. §1630.2(m); *School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 275 (1987).

18.     There is no obligation under the Act to employ people who are not capable of performing the duties of the employment to which they aspire.  *Carter v. Tisch*, 822 F.2d 465, 467 (4th Cir. 1987)(Rehabilitation Act permits employer to release a disabled or injured employee who cannot perform all of his duties); *Southeastern Community College v. Davis*, 442 U.S. 397 (1979) (Rehabilitation Act does not require employer to change job requirements or ignore the fact that the plaintiff could not perform them).  *See*, *Shiring v. Runyon*, 90 F.3d 827, 831 (3rd Cir. 1996) ("employers are not required to create positions specifically for the handicapped employee"); *Fedro v. Reno*, 21 F.3d 1391, 1395 & n. 5 (7th Cir. 1994)(Rehabilitation Act does not "require an employer to *create* alternative employment opportunities for a handicapped employee") (emphasis in original); Davis,

38

442 U.S. at 406 (Rehabilitation Act does not require employer to change job requirements).

19.     Plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802 (1973); *Furnco Constr. Co. v. Waters*, 438 U.S. 567 (1978).  McCloud cannot establish that at the time of the alleged adverse action, she could perform the essential functions of the employment position of Mail Processing Clerk.  In her deposition testimony, McCloud provided continuing detail about how she could not perform the essential functions of the job she was hired to perform. (See, pp. 21-23, *supra*).

20.     The protections of the Americans with Disabilities Act do not apply to just anyone. They are only for individuals who suffer an impairment that substantially limits a major life activity.  By her own testimony, McCloud's stated impairments do not substantially limit any major life activity; therefore, she is not entitled to the protections of the Americans with Disabilities Act.

21.     McCloud's phantom March 31, 2005 RFLD was never presented to the agency for consideration, nor did she ever make it the subject of any grievance or EEO complaint. And, although it is not clear from the Complaint (Doc. 1), she may attempt to include it in this civil action.  However, actions against federal government employers, including the United States Postal Service, brought under Title VII of the Civil Rights Act of 1964 or the Rehabilitation Act must satisfy the requirement of administrative exhaustion in the manner prescribed by Title VII.  *Doe v. Garrett*, 903 F.2d 1455, 1461

(11th Cir. 1990). *See also, Baker v. Peters*, 145 F.Supp.2d 1251, 1255 (M.D. Ala. 2000), *aff'd*, 254 F.3d 1085 (11th Cir. 2001).  Before an aggrieved employee of the federal government may seek relief through the filing of a civil action in court, Title VII requires that he or she must first seek relief in the agency that has allegedly engaged in discrimination.  *Brown*, 425 U.S. at 832 .  This requirement is not a technicality; "[r]ather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel 'primary responsibility' for maintaining nondiscrimination in employment."  *Grier v. Secretary of Army*, 799 F.2d 721, 724 (11th Cir. 1986), *citing*, *Kizas v. Webster*, 707 F.2d 524, 544 (D.C. Cir. 1983), *Hay v. Secretary of the Army*, 739 F. Supp. 609 (S.D. Ga. 1990).

22.     In order to satisfy this requirement, a complainant must seek relief within the agency which allegedly discriminated.  *Brown*, 425 U.S. at 832.  In *Brown*, the Supreme Court stated:  "Section 717(c) permits an aggrieved employee to file a civil action in federal district court to review his claim of employment discrimination.  Attached to that right, however, are certain preconditions.  Initially, the complainant must seek relief <u>in the agency</u> that has allegedly discriminated against him."  *Brown*, 425 U.S. at 831 (emphasis added).

23.     To timely exhaust administrative remedies under Title VII procedures, an aggrieved person must initiate contact with an EEO Counselor within 45 days of the date the alleged discriminatory act occurred. 29 C.F.R. § 1614.105(a)(1). This is the limitations period for raising claims of federal sector employment discrimination, similar to the 180-

day or 300-day filing period allowed for private sector employees under Title VII.  *See, National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Because McCloud did not timely exhaust her administrative remedies with regard to her alleged March 31, 2005 RFLD, her claim for discriminatory or retaliatory denial of that alleged request is barred.

24.    Even if Plaintiff were able to establish a *prima facie* case of disability, sex or race discrimination, she still has the ultimate burden of proving by a preponderance of the evidence that the legitimate reason articulated by the agency for its actions was not its real reason, but was a pretext for discrimination.  *Hicks*, 509 U.S. at 515.  This she cannot do. There was overwhelming evidence that light duty was not given to employees who could not lift 20 pounds, and that Joel Hall's reason for not providing light duty was his concern that she could not safely do the job given her restrictions. Plaintiff cannot establish that the legitimate nondiscriminatory reasons for any employment decisions made were pretexts for disability, sex or race discrimination.

**D.    Retaliation Claim**

25.    To establish a *prima facie* case of retaliation, McCloud must show that she engaged in a protected activity; that the decision maker had knowledge of the activity; that she suffered an adverse action by the Agency; and that there was a causal link between the protected activity and the adverse action. *Johnson v. Palma*, 931 F.2d 203 (2nd Cir. 1991); *Mathur v. Board of Trs. Of Southern Ill. Univ.*, 207 F.3d 938, 941-42 (7th Cir. 2000).  The same test applies under the Rehabilitation Act.  *Johnston v. Henderson*, 144 F. Supp.2d 1341, 1355 n. 6 (S.D. Fla. 2001), *aff'd*, 277 F.3d 1380 (11th Cir. 2001).  McCloud alleged

her employer retaliated against her under the Rehabilitation Act and Title VII by reason of her disability because she had engaged in protected EEO activity and she was pursuing discretionary light duty from her employer.  Similarly (except no USPS employee has a right to light duty), McCloud cannot establish her *prima facie* case of discrimination because she cannot show she suffered an adverse action, nor can she establish any causal link.

26.     McCloud has not shown any relationship between her desire for a day shift and the alleged unlawful decision denying light duty.  *See, Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)("To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct [and] that the protected activity and the adverse employment action were not wholly unrelated."

27.     Plaintiff alleges a causal link for retaliation by Joel Hall and Earl Watson; however, neither of them were named in the other informal matter in 2004.  In actual fact, neither of these persons can recall anything about this informal EEO matter raised against someone else in this Mobile P&DC which is a large industrial facility, with over 300 employees. (Ex. 44, Hall Investigative Affidavit, Questions 10-12 on p. 2 and Answers on p. 5; Ex. 45, Watson Investigative Affidavit, Questions 10-12 on p. 2 and Answers on p. 5)

28.     There must have been some temporal connection, too.  More than a full year had passed since the informal EEO matter was raised against Robert Johnson and when McCloud chose to file in the EEO over the denials of light duty requests in mid and late 2005.  In fact, in the Eleventh Circuit, the courts have found a causal link difficult to

42

establish with the passage of mere months.  *Breech v. Alabama Power Co.*, 962 F. Supp.

1447, 1461 (S.D. Ala. 1997)("[W]here a substantial period of time has elapsed between

the two events – engagement in the protected activity and the adverse employment action

– the causal connection is less likely to exist absent evidence demonstrating a connection

between the two events.  In the present case, more than a year passed between the

protected activity and the discharge.  [Plaintiff's] discharge was not temporally close

enough to support an inference of causal connection.")(also citing many cases where time

periods were too long - 6 mos., 5 mos., 3 mos., 4 mos.); *Leslie*, 963 F. Supp. at  1149

(same); *Balletti v. Sun-Sentinel Co.*, 909 F. Supp. 1539, 1549 (S.D. Fla. 1995)(finding a

six-month lapse was not temporally close enough to support an inference of causal

connection).  *See also*, *Aldridge v. Tougaloo College*, 847 F. Supp. 480, 486 (S.D. Miss.

1994)(16 months "suggests a lack of any causal connection" and cites other district court

cases in which 6 months and 19 months were too long).  Thus, because McCloud cannot

establish this prong of her *prima facie* case, her claims must fail and this motion is due to

be granted.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that there exists no material issue

of fact and the Defendant is clearly entitled to judgment in his favor as a matter of law.  It

is therefore **ORDERED** that Defendant's motion for summary judgment be and is hereby

**GRANTED** and that **JUDGMENT** be entered in favor of the Defendant, John E. Potter,

Postmaster General of the United States Postal Service, and against the Plaintiff, Kim

McCloud, the plaintiff to have and recover nothing of the defendant.  Costs are taxed

against the plaintiff.

      **DONE** this 10th day of May, 2007.

                                         _____s/ W. B. Hand_____
                                         SENIOR DISTRICT JUDGE